## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTA J. DEPTO,                          )
                                          )
                    Plaintiff,            )        3:08-cv-00234
          v.                              )
                                          )
MICHAEL J. ASTRUE, COMMISSIONER           )
OF SOCIAL SECURITY,                       )
                                          )
                    Defendant.            )


## MEMORANDUM OPINION AND ORDER OF COURT

**I.        Introduction**

          Pending before the court are cross-motions for summary judgment based on the

administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document

No. 10) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 8). The

motions have been fully briefed and are ripe for resolution.

          Plaintiff, Krista J. Depto, brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final determination of the Commissioner of Social Security

("Commissioner") that denied her application for supplemental security income ("SSI") and

disability insurance benefits ("DIB") under titles II and XVI of the Social Security Act ("Act"),

42 U.S.C. §§ 401-433, 1381-1383f.[1]

---

[1] Plaintiff has withdrawn her claim for DIB. (R. 43; Plaintiff's Brief at 2, n. 2)

## II.     Background

### A.     Facts

Plaintiff was born on July 18, 1965, and was 39 years old at the alleged onset date, which means that at the time, she was defined as a "younger individual" pursuant to 20 C.F.R. §416.963. (R. 44). Plaintiff has a high school education and was trained as a nurse's aide. (R. 54). Plaintiff's relevant work history was as a store manager and as a nurse's aide. (R. 56). Plaintiff alleges disability as of June 30, 2005, due to reflex sympathetic dystrophy, anxiety, stroke, heart problems, and asthma. (R. 47).

On June 24, 2004, Plaintiff had an echocardiogram showed preserved LV systolic and diastolic function, an ejection fraction of 60% with borderline concentric left ventricular hypertrophy, and minimal insufficiency of the mitral, tricuspid, and pulmonary valves. (R. 166). A stress test and nuclear scans were normal. (R. 167-168).

On August 4, 2004, Plaintiff was examined at Bon Secours Emergency Medical Center for complaints of a headache of three days duration. She came to the hospital because "[a]t work another nurse saw that her one pupil was bigger than the other and she advised her to get checked." An examination was normal with all joints and extremities being freely moveable, a normal motor and sensory system, and normal reflexes. (R. 95). She was diagnosed with possible ischemic attack. After a half hour of monitoring, Plaintiff's pupils were noted as normal, but she was admitted to the hospital. (R. 96). A CT and MRI of the brain showed no abnormalities. (R. 106-107). Chest x-rays were also normal (R. 109).

On January 14, 2005, Plaintiff was examined by Dr. Subhasis Maitra for "2 masses on the dorsum of the left foot" with some pain. (R. 118). He noted that an MRI of the foot

2

revealed ganglion cysts and Plaintiff was referred to Dr. Werkhoven for treatment of the cysts. *Id.*

On February 25, 2005, Plaintiff was admitted to the hospital with chest pain. (R. 127). While in the hospital she had a consultation with her cardiologist, Dr. Hany Shanoudy. He noted that her cardiac enzymes were normal. Upon examination, Dr. Shanoudy's findings were normal and he noted twelve lead EKGs showing normal sinus rhythm. Chest x-rays were also normal. Dr. Shanoudy indicated that Plaintiff should be released from the hospital if she was ambulating without chest pain and return for an outpatient stress test. Plaintiff was advised to quit smoking. (R. 131-132, 143). She was released on February 27, 2005, and scheduled for an outpatient stress test. (R. 127).

On March 10, 2005, Plaintiff underwent a cardiac catheterization which revealed normal epicardial coronary arteries with mild diffuse luminal irregularities, normal LV systolic function with ejection fraction of 55%, and elevated left ventricular and diastolic pressure. A cardiac fluoroscopy revealed "minimal coronary artery calcifications" and a selective coronary angiography revealed moderate sized arteries with mild diffuse luminal irregularities in the right main coronary artery, anterior descending coronary artery, and circumflex coronary artery. The left main coronary artery was free of disease. (R. 170, 330).

Plaintiff was treated on May 25, 2005, for aching pain in the arch of both feet extending up to the mid-tibia and fibula. (R. 233). An examination revealed a mild hallux valgus deformity on both sides, a large right plantar calcaneal spur, and a moderate left plantar calcaneal spur. *Id.*

On June 20, 2005, Plaintiff was treated in the emergency room of Miners Medical Center for asthma. She was given Decadron as well as Benadryl, Pepcid, and Allegra and responded well to those treatments. (R. 188). Plaintiff returned the next day with complaints of shortness of breath, a bit of throat closure, and some vague chest discomfort. (R. 172). The doctor noted that Plaintiff smoked. An examination was normal except for diminished breath sounds and diffuse wheezing throughout. She had an elevated white blood count and cardiac enzymes, but a chest x-ray and EKG were normal. (R. 173). The doctor diagnosed shortness of breath, acute bronchospasm, and chest pains. (R. 174). She was stable during her entire time at Miners and was then transferred to Bon Secours at her request. (R. 174).

She was admitted to Bon Secours for asthma and reported wheezing and significant anxiety. (R. 191). At admission, it was noted that Plaintiff was not in distress. (R. 204). The doctor's impression was asthmatic bronchitis which was to be treated with steroids and antibiotics, and she was counseled on tobacco use as she reported being a three pack a day smoker. (R. 205). A chest x-ray was normal. (R. 230). She underwent a consultation for depression with Dr. Amerneri. Plaintiff reported depressed mood, fatigue, hyperphagia, and suicidal occupation and less frequent episodes of increased energy, increased mood, and decreased need for sleep, which were punctuated by shopping sprees. Upon mental examination, the doctor noted that Plaintiff was tearful and anxious, her thought processes were coherent, thought content did not include hallucinations or delusions, and no suicidal or homicidal ideations were reported. (R. 192). Dr. Amerneri suspected bipolar disorder type 2 and generalized anxiety disorder. (R. 192). The Effexor that she was receiving from her primary care physician was increased, and she was started on BuSpar and Depakote. (R. 191).

4

She had a consultation with Dr. Rashmikant Pandit for her asthma on June 22, 2005, while in the hospital. An examination was normal and he noted his impression as acute exacerbation of asthmatic bronchitis, smoking, and hypertension. (R. 194-195). She was released from the hospital on June 27, 2005. (R. 197).

On July 11, 2005, Plaintiff completed a daily activities questionnaire indicating that she was dependent on others for care, sometimes used a chair to bathe, no longer drove, had her son pay the bills and take out the trash, had a neighbor mow the lawn, did laundry and prepared meals, vacuumed, and did other housework slowly or with help. (R. 59-60). She further noted that she was not able to unload grocery bags from the car, but could carry three bags at a time and needed to rest while shopping. *Id.* She reported she could walk one hundred yards, could climb three steps, and could not sit for long and experienced difficulties with breathing and pain in her knees with all of these activities. (R. 60). In relation to her ability to take care of her personal needs, she reported needing to rest while dressing, showering, and making her bed. (R. 61). With respect to her relationships with others, she noted no problems in getting along with family, friends, and authority figures, but noted problems receiving criticism and difficulty going out in public. (R. 62). She reported forgetfulness when trying to remember and understand directions and emotional problems with changes in her daily schedule. (R. 64). In regard to her pain, Plaintiff noted problems with her back, knees, ankles, right arm, and chest. *Id.* She reported difficulty sleeping and weight gain. (R. 65). Finally, she reported being capable of walking without assistance or an assistive device. (R. 66).

On July 19, 2005, an MRI of Plaintiff's foot revealed mild edema and inflammation of the left foot with no evidence of recurrent ganglion. (R. 489). A pulmonary function test was

5

performed on August 15, 2005. (R. 235). The test results revealed a small airways obstructive defect with lung volumes within normal limits and a mild decrease in diffusing capacity, which was interpreted as an insignificant response to the bronchodilator. (R. 236).

Plaintiff underwent a physical evaluation with Dr. Mohammed Dowlut on August 26, 2005. Plaintiff reported a history of reflex sympathetic dystrophy, anxiety, heart problems, stroke, asthma, and pain in her knees. (R. 249). Her medications were listed as Norvasc, Nitro patch, potassium chloride, furosemide, Zoloft, buspirone, alprazolam, Depakote, loratadine, Protonix, Effexor, DuoNeb, and Seroquel. (R. 250). Dr. Dowlut reported that Plaintiff was in no apparent distress and was obese with a normal examination. (R. 251-252). Skin was normal; head, ear, eyes, nose, and throat were unremarkable; neck was normal; head was symmetrical; lungs were clear without any wheezes, rails, or rhonci; the heart had normal rhythm, was free of murmurs, and the size was not increased; abdomen was soft and flat without oranomegaly present; lymphatics were negative; a neurological exam was completely normal; and an examination of the extremities showed no effusion and no crepitation with normal range of motion in the knees, normal range of motion in the ankles, and normal gait. *Id.* Dr. Dowlut noted his impression as a history of reflex sympathetic disorder in the right upper extremity, history of chronic anxiety and bipolar disorder, history of possible transient ischemic attack, history of asthma, controlled hypertension, and obesity. (R. 252).

Dr. Dowlut also completed a functional capacity evaluation noting that Plaintiff could occasionally to frequently lift and carry twenty pounds; was unlimited in her ability to push and pull, occasionally could bend and climb; could never stoop, crouch, and balance; and was restricted in some degree from experiencing temperature extremes, dust, fumes, odors, gases,

and humidity. (R. 253-254). No notation was made as to Plaintiff's ability to sit and stand, but the record noted she claimed she could sit for seven hours out of an eight hour day. *Id.*

On August 29, 2005, Plaintiff was examined by Dr. Christopher McClelland, an orthopedist, for complaints of bilateral knee pain, back pain, and calf pain. Upon musculoskeletal examination, her upper bilateral extremities were neurologically intact; some weakness was present in both quads and her turbosity anterior; clonus and Babinski signs were negative; full range of motion was present in both hips and both knees; and exquisite tenderness over her patella was present. X-rays of her hips and knees were normal. X-rays of her back showed degenerative disc disease at L4-L5 with arthritic facet, arthritic facet at 5-1, and retrolisthesis of 3 on 4. Dr. McClelland diagnosed probable spinal lumbar stenosis and patellofemoral syndrome of the bilateral knees. She was prescribed physical therapy. (R. 255, 320). On the same date, Plaintiff underwent an echocardiogram. The test revealed preserved LV function and LVEF of 55%, trace mitral and tricuspid insufficiency, and pulmonary arterial pressure of 30 millimeters of mercury. (R. 329, 487).

On September 8, 2005, Plaintiff underwent a psychological evaluation by Dr. Steven Pacella, at the request of the disability claims adjudicator. Upon examination, Plaintiff was fully oriented to her surroundings, alert, and adequately responsive. She was able to maintain eye contact and was not acutely anxious but was depressed and emotionally labile. He further reported that she exhibited no obvious pain behaviors, had normal speech, was affectively appropriate, was not internally entertained or perceptually disturbed, maintained normal stream of thought, displayed no defect of remote recall, and had limited insight, judgment, and problem solving. Plaintiff did not perform serial sevens and retrieved no more than 4 digits forward and

7

three back. Dr. Pacella also noted that she recalled two of three words after an interference task and reasoned mathematically at the low borderline level. Plaintiff found commonalities between objects and ideas but offered below expectation funds of both information and verbal concepts. Dr. Pacella diagnosed dysthymia, chronic secondary type/rule out mood disorder, secondary to general medical condition and rule out cognitive disorder, NOS. (R. 258-259).

With respect to the effect of Plaintiff's impairments on her function, Dr. Pacella noted that Plaintiff had only limited concentration, but was able to understand, retain, and follow directions. He also noted that "while in no danger of imminent decompensation, [Plaintiff] is less-than-nominally tolerant of adult stress, pressure or adult responsibility." In conclusion, Dr. Pacella reported that "Ms. Depto appears to be an only marginal candidate to work within a schedule, attend to a task or sustain a consistent competitive routine for more than brief periods." (R. 260). Dr. Pacella noted between slight and moderate limitations in understanding, remembering, and carrying out detailed instructions and making judgments on work related decisions; slight limitations in interacting appropriately with the public and supervisors; and moderate to marked limitations in interacting appropriately with co-workers, pressures in the usual work setting, and changes in a routine work setting. (R. 261).

On October 11, 2005, Dr. Robert Booth, a state agency medical consultant, completed a functional capacity assessment noting that Plaintiff suffered from no exertional, postural, manipulative, visual, communicative, or environmental limitations. (R. 75-82).

On the same date, Plaintiff was evaluated for nasal, chest, and headache symptoms by Dr. Jeffrey Rosch. An examination was normal. Plaintiff tested positive for allergies. Plaintiff was continued on Advair and placed on Q-Var. She was told to stay away from humidifiers,

vaporizers, dehumidifiers, damp basements, and cats. Allergy injections were recommended. (R. 429-433).

On October 21, 2005, Dr. Link Manella, a state agency consulting psychologist, completed a psychiatric review technique noting that Plaintiff's mental impairments were anxiety and a history of substance abuse . He reported mild limitations in the activities of daily living, moderate limitations in maintaining social functioning, and in maintaining concentration, persistence, and pace and noted insufficient evidence in assessing periods of decompensation. (R. 276-288). Dr. Manella reported that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for prolonged periods; perform activities within a schedule, maintain regular attendance, and be punctual within normal tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rests; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 289-290).

Plaintiff underwent a psychiatric evaluation on December 12, 2005, with Dr. Maryanne Martin. Plaintiff reported flashbacks to sexual and physical abuse, some manic episodes, depression, and financial stress. Plaintiff denied recent drug and alcohol use. Upon mental examination, Plaintiff was oriented times three; had a tearful and depressed affect; complained of feeling hopeless, being severely anxious, having memory problems and occasionally having visual and auditory hallucinations; had fair insight and judgment; and low

9

average intelligence. Dr. Martin diagnosed post traumatic stress disorder and bipolar disorder NOS with a GAF of 45.[2] She was placed on Seroquel. (R. 413-416).

Plaintiff was examined by Dr. McClelland on November 14, 2005, for complaints of right knee pain. Dr. McClelland noted that Plaintiff did not attend physical therapy as prescribed. Plaintiff reported that her knee was "giving out on her at times." On physical examination, her bilateral lower extremities were neurologically intact with poor range of motion in her right knee, significant tenderness of the patella, a positive Apprehension sign, and positive sign for crepitation over the right patella. X-rays of the right knee were normal with mild subluxation over her right patella. He diagnosed probable patellofemoral syndrome of the right knee and recommended a minimum of three months of physical therapy to strengthen her muscles and ordered an MRI. (R. 319).

On November 18, 2005, Plaintiff was seen at the emergency room at Bon Secours for complaints of a right dilated pupil, right facial droop, and drooling that had occurred that morning. She reported feeling better once in the hospital. Upon examination, all systems were

---

2

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 41-50 denotes severe impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51-60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41-50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." *Id.*

normal including her eyes, cranial nerves, and cerebral function. A CT of the head was normal. She was discharged on the same day. (R. 294-301, 311).

On December 5, 2005, Plaintiff was again examined by Dr. McClelland for knee pain. Dr. McClelland noted a continuing diagnosis of patellofemoral syndrome of the right knee. An MRI showed no ligamentous or meniscal damage, no meniscal tears, and was essentially normal. Dr. McClelland referred Plaintiff to his colleague Dr. Tyndall. (R. 318).

Plaintiff underwent a neurological consultation on December 21, 2005 for Plaintiff's complaints of transient ischemic attacks. Physical, neurological, cranial nerve, motor, sensory, deep tendon reflexes, and cerebellar examinations by Dr. Mark Lipitz were all normal. Dr. Lipitz ordered blood tests, an MRI of the brain and spine, and an EEG with the recommendation that Plaintiff stop smoking completely. (R. 392-395). Plaintiff underwent an MRI of the cervical spine and head on December 30, 2005. The MRI of the cervical spine was normal, and the MRI of the head was compromised due to movement. (R. 314). Plaintiff also had a normal range awake and drowsy stage II EEG. (R. 404).

On January 1, 2006, Plaintiff was evaluated for nasal and chest symptoms by Dr. Jeffrey Rosch. Plaintiff reported congested nose and occasional chest congestion, coughing, shortness of breath and wheezing. A physical examination was normal, and pulmonary test results were normal with her medication. Plaintiff was continued on her medications. (R. 425-428).

Plaintiff was examined by Dr. Shanoudy on January 30, 2006, for complaints of chest pain, shortness of breath, and swelling. An EKG demonstrated sinus rhythm with poor R-wave progression, but Dr. Shanoudy noted that Plaintiff was doing "fairly well." (R. 324). A physical

examination was normal with some diminished breath sounds and expiratory wheezing, but regular rate, normal rhythm, and lack of murmurs in the heart. Dr. Shanoudy noted that asthma was likely the reason for her symptoms. Plaintiff was instructed on dietary changes and smoking cessation. (R. 325). A stress test was performed on February 20, 2006, indicating a fixed anterior wall defect likely related to breast attenuation artifact. (R. 485).

Plaintiff was examined by Dr. William Tyndall, an orthopaedist, on February 17, 2006, for complaints of knee pain. On examination, Plaintiff had a high Q angle and patellofemoral crepitus with range of motion. An MRI showed an increased Q angle and laterally subluxed patella. She noted that she had not attended physical therapy due to cost. Dr. Tyndall recommended surgery in the form of a tibial tubercle osteotomy for re-alignment and recommended that Plaintiff wait until she after she had gastric bypass surgery to have knee surgery. (R. 316-317). Dr. Tyndall noted that he hoped surgery would improve her pain by fifty percent and requested to see her back when she was ready for knee surgery. *Id.*

Plaintiff had a ganglion cyst removed from her left foot on March 8, 2006, with no apparent complications to surgery. (R. 378-379). Post-surgery follow-up examinations were all normal. (R. 357-366). On April 17, 2006, Plaintiff reported a left ankle injury. X-rays revealed no fracture, dislocation, or significant arthritic changes. (R. 377). An MRI of Plaintiff's left foot was performed on April 20, 2006, and revealed a transverse fracture. (R. 376). On May 15, 2006, x-rays of the right foot revealed no fracture, dislocation, or significant arthritic changes. (R. 375).

Plaintiff had chest x-rays and an upper GI on March 21, 2006, due to morbid obesity. The results were normal. (R. 449, 450). On April 25, 2006, Plaintiff was seen in the emergency

12

room for complaints of left side weakness earlier in the day that had improved by arrival. (R. 342). All systems were normal on examination. Possible transient ischemic attack was noted. (R. 343-344). Plaintiff underwent a CT of the head and chest x-rays. The CT scan was negative and chest x-rays revealed a lack of active cardiopulmonary process. (R. 312-313). Plaintiff was discharged the same day. (R. 347).

In April 2006, Dr. Martin noted that it was appropriate from a mental health standpoint for Plaintiff to pursue gastric bypass surgery due to Plaintiff showing good improvement and not being as depressed as when initially seen. (R. 418).

Plaintiff had x-rays of her knees on May 26, 2006. The right knee showed mild degenerative changes and the left knee was normal. (R. 483). On June 19, 2006, Plaintiff underwent a sleep study, which indicated mild obstructive sleep apnea with an Apnea Hypopnea Index of 7.5. (R. 447). Plaintiff was instructed by Dr. Timothy Lucas to use a CPAP machine during sleep. Dr. Lucas noted that the need for the CPAP would be unlikely with weight loss through gastric bypass. (R. 439-440).

On July 7, 2006, Dr. Martin completed a functional capacity evaluation opining that Plaintiff had marked limitations in all categories. (R. 409-411). Plaintiff was assessed a GAF of 60. (R. 412). On November 1, 2006, a notation was made by mental health staff that Plaintiff had attended seven out of ten therapy sessions, but no records from the sessions were in the transcript. Mental health staff noted Plaintiff's diagnosis of bipolar disorder NOS and post traumatic stress disorder with a GAF of 55. Plaintiff reported poor memory, severe anxiety, some visual and auditory hallucinations, feelings of hopelessness, isolating herself, and at times,

having difficulty leaving her home. Her therapist Judy Birch suggested continued therapy and medication. (R. 520).

Plaintiff was examined again for nasal and chest complaints by Dr. Rosch on August 31, 2006. An examination was normal. Pulmonary test results were also noted as normal. Dr. Rosch opined that Plaintiff's problems were not an exacerbation of asthma, but instead musculoskeletal due to coughing. (R. 420-424).

At the hearing held November 14, 2006, Plaintiff testified that she worked as a nurse's aide in three different positions. She left the second job because she did not get along with a co-worker. She also worked in a pharmacy stocking medications, but indicated she left due to having to stand to perform her duties. (R. 574-578). She reporting leaving her third nurse's aide position due to mini-strokes, panic, anxiety, and back problems. (R. 580). Plaintiff testified that her reflex sympathetic dystrophy did not keep her from working. (R. 580-581). With respect to her anxiety, Plaintiff testified that she had eight panic attacks in the two weeks prior with two being severe. (R. 582). Plaintiff also stated she had suffered six to seven mini-strokes and was an inpatient at the hospital for one, but was sent home. She also noted that her heart and stroke problems were one and the same. (R. 582). She reported terrible asthma attacks requiring the use of a nebulizer four times a day, but required no emergency treatment in the last year. (R. 583). She further reported knee and back pain. (R. 584). Plaintiff noted drowsiness as a side effect to her medications. (R. 587).

With respect to her sleep apnea, Plaintiff noted that the CPAP was helping her sleep. (R. 589). Plaintiff reported using a bath chair to bathe, cooking simple meals, not being capable of doing dishes, and being incapable of most other activities. (R. 590-591). Plaintiff also

14

reported watching TV and emailing. (R. 592). She reported receiving help from her neighbor, her sister, her niece, and her sons. (R. 596-597). Plaintiff noted smoking, but denied ever being treated for substance abuse. (R. 595). She reported taking an Epi-Pen and nerve pills during severe anxiety attacks. (R. 598-599). She further reported wearing a knee brace and using a walking device, which she claimed were prescribed by her doctor. (R. 599).

Following Plaintiff's testimony, the ALJ posed a hypothetical question to the vocational expert. The hypothetical assumed an individual limited to light work capable of occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing; must avoid concentrated or prolonged exposure to fumes, odors, dusts, gases, extreme dampness, humidity, or environments with poor ventilation and hot/cold temperatures; was limited to unskilled work, simple work-related decisions, and in general, relatively few workplace changes; and was limited to occasional interaction with supervisors, co-workers, and the general public. (R. 608). The VE testified that the hypothetical person could return to her prior work as a pill sorter and could perform other light and sedentary jobs that existed in signficant numbers in the national economy. (R. 608-609).

### B.    Procedural History

Plaintiff protectively filed the instant applications for DIB and SSI on June 14, 2005, alleging disability since June 30, 2005. (R. 43).[3] The claim was denied. (R. 15-16). This case was then randomly selected by the Commissioner to test modifications to the disability determination process, so the reconsideration step of the administrative review process was eliminated, and Plaintiff was given the opportunity to seek review of the unfavorable initial

---

[3] Plaintiff has amended her onset date. (R. 43; Plaintiff's Brief at p. 2, n.1).

determination by an Administrative Law Judge without first seeking reconsideration. *Id.* At

Plaintiff's request an administrative hearing was held on November 14, 2006 before

Administrative Law Judge Patricia C. Henry ("ALJ"). (R. 569-615). Plaintiff, who was

represented by counsel, testified at the hearing. (R. 569-602). Mitchell Schmidt, a vocational

expert, also testified at the hearing. (R. 602-615).

On April 2, 2007, the ALJ rendered a decision that was partially unfavorable to

Plaintiff under the five-step sequential analysis used to determine disability. (R. 619-630). The

ALJ found the following:

1.      The claimant has not engaged in substantial gainful activity
        since June 30, 2005, the amended alleged onset of disability
        date 20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and
        416.971 *et seq.*).

2.      The claimant has the following severe impairments: an
        Affective Disorder/Bipolar disorder, anxiety disorder, and
        obesity (20 CFR 404.1520(c) and 416.920(c)).

3a.     Reflex Sympathetic Dystrophy (RSD), chronic heart failure,
        status-post excision of a ganglion cyst and nerve entrapment
        release, hypertension, and substance abuse history are non-
        severe impairments.

3.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals one of the listed
        impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20
        CFR 404.1520(d), 404.1525, 404.1525, 416.920(d), 416.925
        and 416.926).

4.      After careful consideration of the entire record, the
        undersigned finds that the claimant has the residual functional
        capacity to perform light exertion limited to occasional
        postural maneuvers, such as balancing, stooping, kneeling,
        crouching, crawling and climbing (ramps-stairs/ladder-rope-
        scaffold). She must avoid concentrated/prolonged exposure to
        fumes, odors, dusts, gases, environments with poor

16

ventilation, extremes of heat and cold, and extreme dampness and humidity. She is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes.

5. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6. The claimant was born on July 18 ,1965 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), 416.966).

10. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2005 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(R. 619-630).

## III.   Legal Analysis

### A.   Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g). If the Commissioner's finding is supported by substantial

17

evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and (5) if not, whether he or she can perform other work. *See* 42 U.S.C. § 404.1520; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1). This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20

C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,

(2)  in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

### B.  Discussion

Plaintiff makes two arguments claiming error on the part of the ALJ. First, Plaintiff claims that the ALJ did not properly explain the weight given to the records of her mental impairments. In addition, Plaintiff argues that the decision of the ALJ did not discuss her well-documented impairment of patellofemoral syndrome and diagnosis of probable lumbar spinal stenosis. The Commissioner contends that the ALJ's opinion was supported by substantial evidence.

19

### 1. *Plaintiff's Mental Impairments*

Plaintiff argues that the ALJ erred in failing to properly explain the weight given to the opinions of Dr. Pacella, mainly his opinion that Plaintiff was "only a marginal candidate to work within a schedule, attend to a task or sustain a consistent, competitive routine for more than brief periods." (R. 260). Her arguments conclude that the Dr. Pacella's report along with the findings of Dr. Martin and other evidence of her physical impairments constitutes substantial evidence supporting a finding of disability.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999) (quoting *Plummer*, 186 F.3d at 429). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527 (d)(2), 416.972 (d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and

laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §§ 404.1527(d), 416.927(d).

With respect to non-examining sources, "[b]ecause non-examining sources do not have an examining or treating relationship with the claimant, the weight accorded to their opinions depends upon the degree to which they provide supporting explanations for their opinion." 20 C.F.R. §§ 404.1527, 416.927. To the extent the explanations are consistent with the other substantial evidence in the case, such opinions from non-treating sources are entitled to more weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). Finally, an ALJ is not bound by findings of a state agency medical or psychological consultant. 20 C.F.R. §§ 404.1527, 416.927.

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. *Stewart v. Sec'y of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

The ALJ gave some weight to the opinions of Dr. Pacella, but did not wholly adopt his opinions regarding Plaintiff's ability to perform sustained work. In her opinion, the ALJ stated that "[t]he limitations assessed by Dr. Pacella and the state agency psychologist have been accounted for in the claimant's established residual functional capacity." (R. 625). The ALJ discussed all of Dr. Pacella's findings from the consultative examination including that Plaintiff was fully oriented to her surroundings, alert, and adequately responsive; was able to maintain

21

eye contact; was not acutely anxious but was depressed and emotionally labile; had normal speech; was affectively appropriate; was not internally entertained or perceptually disturbed; maintained normal stream of thought; displayed no defect of remote recall; and had limited insight, judgment, and problem solving. The ALJ also noted that Plaintiff did not perform serial sevens and retrieved no more than four digits forward and three back; recalled two of three words after an interference task and reasoned mathematically at the low borderline level; and found commonalities between objects and ideas but offered below expectation funds of both information and verbal concepts. The ALJ adequately reported Dr. Pacella's diagnosis of dysthymia, chronic secondary type/rule out mood disorder, secondary to general medical condition and rule out cognitive disorder, NOS. (R. 258-259, 625-626).

Plaintiff specifically takes issue with the ALJ's failure to mention the exact statement by Dr. Pacella that Plaintiff was "only a marginal candidate to work within a schedule, attend to a task or sustain a consistent, competitive routine for more than brief periods." (R. 260). The ALJ did, however, discuss the underlying functional capacity findings relating to this statement. The ALJ stated, "given Dr. Pacella's findings of her performance on various tests that he gave her, the claimant does display limitations with concentration, persistence, and pace." (R. 627). With respect to the statement serving as an opinion on Plaintiff's ability to work, a statement by a treating or examining source on a matter reserved to the Commissioner is not dispositive or controlling. *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) *citing Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)("this type of [medical] conclusion cannot be controlling. 20 C.F.R. § 404.1527(1989) indicates that [a] statement by your physician that you are disabled or unable to work does not mean that we will determine that you are disabled. We have to review

the medical findings and other evidence that support a physician's statement that you are disabled.")(internal citations omitted). Therefore, it is evident that the ALJ properly addressed Dr. Pacella's opinion and did not err in failing to specifically note this statement.

Plaintiff suggests that the findings of Dr. Pacella and those of Dr. Martin, taken together, provide evidence of disabling mental impairments. The ALJ noted all of Dr. Martin's findings from the psychiatric evaluation. (R. 413-416). She suggested that "Dr. Martin did not conduct any psychiatric tests but accepted claimant's allegations and opined that claimant had a GAF of 45...representative of serious symptoms." (R. 626). A mental status examination was only performed on one occasion and no records provide indications of any further treatment until April 5, 2006, when Dr. Martin opined that Plaintiff was showing good improvement in her depression. (R. 418, 626). On July 7, 2006, Dr. Martin noted that Plaintiff had marked limitations in all categories, but as the ALJ properly noted, "Dr. Martin [also] opined that claimant had a GAF score of 60....borderline moderate to light symptoms." (R. 412, 626). Considering this incongruity along with the lack of support for these findings in the record, the ALJ properly determined that Dr. Martin's notation of marked limitations were not supported by substantial evidence. (R. 626).

In any event, the ALJ did give some weight to the limitations addressed by Dr. Pacella limiting Plaintiff to simple, routine, repetitive tasks, not performed in a fast-paced production environment to address Dr. Pacella's notation of a slight to moderate limitation in understanding, remembering, and carrying out detailed instructions and moderate to marked limitation in dealing with pressures in the usual work setting. In addition, the ALJ limited Plaintiff to simple, work-related decisions to address Dr. Pacella's notation that Plaintiff had

23

slight to moderate limitations in making judgments on work related decisions. The ALJ limited Plaintiff to relatively few workplace changes to address Dr. Pacella's opinion that Plaintiff had moderate or marked limitations dealing with changes in the routine work setting. Finally, the ALJ limited Plaintiff to "occasional interaction with co-workers, supervisors, and the general public" to address Dr. Pacella's opinion that Plaintiff was moderately to markedly limited in interacting with co-workers and slightly limited in interacting appropriately with the public and supervisors.[4] (R. 627).

In formulating her opinion, the ALJ also gave some weight to the reports of the consulting psychiatrist, Dr. Link Manella. Dr. Manella opined that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for prolonged periods; perform activities within a schedule, maintain regular attendance, and be punctual within normal tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rests; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 289-290). Dr. Manella assigned only mild limitations to Plaintiff's activities of daily living. *Id.* These limitations were properly incorporated into the ALJ's residual functional capacity assessment and are supportive of her

---

[4]

The limitation of "occasional interaction with co-workers, supervisors and the general public" was included in the ALJ's hypothetical to the vocational expert and therefore was incorporated into his testimony. (R. 608-609). It does not appear in the bolded number four finding of the opinion but is discussed and noted in the body on the opinion.(R. 626-627). Therefore this omission from the findings itself is not in error.

conclusions. Therefore, the ALJ's opinion properly addressed the weight given to Plaintiff's mental health treatment records, and her conclusions were properly supported.

### 2. *Orthopaedist Records*

Plaintiff also argues that the ALJ erred in failing to address the orthopaedists' medical records, which included a diagnosis of patellofemoral syndrome[5] of the right knee and probable spinal lumbar stenosis. Neither Dr. McClelland nor Dr. Tyndall ever gave an opinion on the effect of Plaintiff's right knee problems on her ability to work, but Dr. Tyndall did conclude that surgery would likely reduce her pain by fifty percent. (R. 316-317). A diagnosis of "probable lumbar stenosis" was noted in one record of Dr. McClelland. (R. 255, 320).

The ALJ's discussion of Plaintiff's knee problems was limited. Despite the medical records and diagnosis, patellofemoral syndrome was not mentioned anywhere in the opinion. Mention of Plaintiff's knees was limited to the residual functional capacity discussion and did not include mention of Dr. McClelland and Dr. Tyndall's records. The records indicated a recurrent diagnosis of patellofemoral syndrome in the right knee beginning in August 2005. (R. 255, 316-317, 318, 319, 320). In February 2006, Dr. Tyndall recommended surgery to relieve pain. (R. 316-317). These findings were supported by x-rays and MRIs. (R. 255, 316-317, 318, 319, 320).

The only notations relating to Plaintiff's knees in the ALJ's opinion were drawn from Dr. Dowlut's consultative examination in August 2005. At the time, he noted no crepitation

---

[5]

Patellofemoral syndrome (also known as chondromalacia) is the softening and degeneration of the tissue underneath the knee cap. National Institutes of Health/ U.S. National Library of Medicine, *Chondromalacia, available at* http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm (last visited March 12, 2010).

with normal range of motion in the knees. He further noted that her gait was normal and that she could walk without the aid of an assistive device. (R. 250-252, 625). Despite this examination, there was a well-documented and supported diagnosis of patellofemoral syndrome that was not addressed in the opinion. The regulations clearly require the Commissioner to consider all of a claimant's severe and non-severe impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Lambert v. Astrue* 2009 WL 425603, *13 (W.D.Pa. 2009). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence...[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Burnett v. Commissioner*, 220 F.3d 112, 121 (3d Cir. 2000)(citations omitted). This impairment should have been considered along with the other well-documented impairments of record.

No matter the severity of Plaintiff's knee problems, they should have been considered in conjunction with Plaintiff's other impairments. The diagnosis was made by treating doctors based on objective testing. Citation to Dr. Dowlut's consultative exam with no mention of her treatment with the orthopaedists was not sufficient. As a result, this case will be remanded for further consideration of Plaintiff's diagnosis of patellofemoral syndrome in determining residual functional capacity.

Plaintiff also claims that the diagnosis of "probable lumbar spinal stenosis" was not addressed and should have been considered by the ALJ. While this possible diagnosis was noted on one occasion, there was no follow-up on this issue and no definitive diagnosis. The only mention of this issue came in one record of Dr. McClelland. As such, it was not in error that this

diagnosis was not discussed in the record as the "probable" diagnosis was never confirmed. (R. 255, 320).

**IV.     Conclusion**

Under the Social Security regulations, a federal district court reviewing the decision of the Commissioner denying benefits has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all evidence contained in the record, the Court finds that this case will need to be remanded for consideration of Plaintiff's patellofemoral syndrome.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTA J. DEPTO,                            )
                                            )
                Plaintiff,        )        3:08-cv-00234
    v.                                      )
                                            )
MICHAEL J. ASTRUE, COMMISSIONER             )
OF SOCIAL SECURITY,                         )
                                            )
                Defendant.        )

## ORDER OF COURT

**AND NOW**, this 23rd day of March 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.    Defendant's Motion for Summary Judgment (Document No. 10) is **DENIED.**

2.    Plaintiff's Motion for Summary Judgment (Document No. 8) is **DENIED** insofar as it seeks an award of benefits and **GRANTED** insofar as it requests a remand for further proceedings not inconsistent with this opinion.

3.    The Clerk will docket this case as closed.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    Stanley Hilton, Esquire
       Email: GO2166@aol.com

       John J. Valkovci, Jr., Esquire
       Email: john.valkovci@usdoj.gov